Susan **MOLINARI**, Guy V. Molinari
and Robert DiCarlo, Plaintiffs,

v.

The NEW YORK TRIBOROUGH
BRIDGE AND TUNNEL AUTHORITY,
The New York Metropolitan Transporta-
tion Authority, Defendants.

No. 92 CV 4846 (ERK).

United States District Court,
E.D. New York.

Dec. 9, 1993.

Cawes & Birmingham by Richard Bir-
mingham, Staten Island, for plaintiffs.

Robert Bergen, Gen. Counsel, Metropoli-
tan Transp. Auth. by Susan E. Weiner, Dep.
Gen. Counsel, Anthony Semancik, Sr. Associ-
ate Counsel, New York City, for defendants.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Susan Molinari, who represents Staten Is-
land in Congress, Guy V. Molinari, who is the
President of the Borough of Staten Island,
and Robert DiCarlo, who was elected recent-
ly to the New York State Senate from Bay
Ridge, challenge the 1989 and 1993 toll in-
creases on the Verrazano–Narrows Bridge.
The essence of their complaint is that these
toll increases are unjust and unreasonable
because their sole purpose is to generate
subsidies for the public transportation com-

ponents of the Metropolitan Transportation Authority ("MTA"). The discussion of the legal arguments underpinning the complaint requires first a brief description of the nature of the transportation system in the New York metropolitan area and the circumstances that led to the creation of both the MTA and the legislative scheme that mandates the subsidies at issue here.

The New York metropolitan area is more dependent on public transportation than any other region in the United States. Nearly seven million passengers use public transportation each day in the region that includes New York City, Long Island, Westchester, Dutchess, Putnam, Rockland, and Orange counties in New York, and Fairfield County in Connecticut. Virtually all of these passengers use one of the transit modes operated by the Metropolitan Transportation Authority, specifically, the New York City Transit Authority ("TA") buses and subways, Staten Island Rapid Transit Authority ("SIRTOA") subways, Metro–North Commuter Railroad and Long Island Rail Road trains and Metropolitan Suburban Bus Authority ("MSBA") buses.

Public transportation is critical because of the dense population of the area, because much of the City of New York and its eastern suburbs are located on three islands that are connected to each other and the mainland by a limited number of bridge and tunnel crossings, and because such a large proportion of traffic each day goes into and out of Manhattan Island. Indeed, more than 3.8 million transit trips and 1.9 million vehicular trips each day are made into or out of the narrow confines of the Manhattan Central Business District, located south of 60th Street.

While the MTA's Triborough Bridge and Tunnel Authority ("TBTA"), which operates nine bridges and tunnels in New York City, including the Queens–Midtown and Brooklyn Battery tunnels as well as the Triborough, Throgs–Neck, Whitestone, and Verrazano–Narrows bridges, provides crossings for more than 750,000 trips each day, vehicular traffic would grind to a halt without the commuter rail, subway and bus lines that serve New York City and its suburbs.

Notwithstanding the critical role of public transportation, its needs were largely ignored for decades. Instead, public resources were devoted mainly to the construction of highways, bridges and tunnels. While new facilities were constructed in the hope of alleviating traffic on existing facilities, each new facility had the effect of increasing the overall volume of vehicular traffic without any meaningful reduction in the volume of traffic on existing facilities.

The Brooklyn Battery Tunnel, which opened on May 25, 1950, provides an illustration of such traffic generation. When it opened, the forecast was that it would carry 8,400,000 cars during its first year of operation. By the end of its first six months of operation it was carrying traffic at 15,000,-000–vehicle–per–year rate. Indeed, by 1952 it was carrying up to three times the rush hour load of 2000 that it was engineered to handle. As Robert Caro has observed in his classic biography of Robert Moses, who was Chairman of the TBTA:

> Moses had expected it to draw off traffic from the parallel Queens–Midtown Tunnel and three free East River bridges. But traffic on the bridges remained "normal," which meant jammed. And traffic through the Queens–Midtown Tunnel, fed now by the widened Queens–Midtown Expressway, increased instead of decreasing. In 1951, while the Brooklyn–Battery Tunnel was carrying cars at a rate of 79.3 percent above estimates, traffic through the Queens–Midtown Tunnel was 26.3 percent higher than ever before. Previously 10,-967,000 cars per year had been trying to use one tunnel. Now there were two tunnels—and 28,445,668 cars were trying to use them. The situation at the southern portion of the East River was duplicated at the northern.

Robert A. Caro, *The Power Broker* 911 (Vintage Books Edition 1975).

The same pattern of traffic generation followed the construction of the Verrazano–Narrows Bridge. "With the opening of the Verrazano–Narrows Bridge, which within two years of its opening in 1964 was carrying 21,000,000 cars per year, a traffic level Moses

had believed it would not attain until 1980, traffic volume on Long Island experienced not a jump but a huge surge." *Id.* at 950–51. This surge led to plans for further highway construction and to the actual construction of a second deck on the Verrazano–Narrows Bridge that almost doubled its capacity. *Id.* This construction, in turn generated more traffic. Indeed, last year in excess of 63,000,000 toll paying vehicles crossed over the Bridge.

Not only did new construction have the effect of generating more traffic, but the rate of increase was fueled significantly by the concomitant neglect of the kind of mass transportation that would have provided an alternative to the use of automobiles during rush hours.

> The failure to maintain existing railroad lines in a condition that would persuade even their present riders to keep using them, much less to attract new ones, the failure to construct new lines into newly developed areas, while building new highways into these areas, was driving more and more commuters off the railroad and onto the highway. The effect on the city of the widening gap could only be disastrous.

*Id.* at 917.

The end result of this policy is vividly described by Caro. "By 1968 ... with the annual surplus of Moses' Triborough Bridge and Tunnel Authority running more than $30,000,000 per year, every suburban railroad in the New York metropolitan area was either bankrupt or teetering on the brink." *Id.* at 939. Similarly, New York City's mass transportation system, which once "was probably the best in the world," had by then become "quite possibly the worst." *Id.* at 933. While New York had highways, bridges and tunnels that ranked "with the greatest feats of urban construction in recorded history," nothing about these facilities "was as awesome as the congestion on them." *Id.* at 940.

Ultimately recognizing "that the movement of people and goods in a great metropolitan region required a *balanced* transportation *system*," *id.* at 897, the New York State Legislature created the Metropolitan Transportation Authority in 1968. Under the umbrella of the MTA, the operations of the toll generating bridges and tunnels of the TBTA and the public authorities that operated the subways and the commuter rail and bus lines were effectively merged. In so doing, the legislature found that:

> It is the sense of the legislature, as a matter of state concern, that a greater degree of coordination of effort should now be sought with respect to the activities of ... the metropolitan commuter transportation authority, the New York city transit authority, the triborough bridge and tunnel authority and the Manhattan and Bronx surface transit operating authority;
>
> To this end, *it is the purpose of this title to place each of these authorities under common control by a single board and to impose upon that board the additional responsibility of developing and implementing a unified mass transportation policy for such region.*

1967 N.Y.Laws c. 717, Title 9, § 60, (emphasis supplied).

To provide financial assistance to implement the mandated "unified mass transportation policy," the legislature authorized the use of surplus funds of the TBTA for mass transportation purposes as follows:

> Notwithstanding any provision of this title or any other provision of law, general, special or local, the authority may from time to time transfer and pay over to metropolitan transportation authority or New York city transit authority all or any part of its surplus funds in accordance with the provisions of subdivision twelve of section five hundred fifty-three of this chapter.

N.Y.Pub.Auth.Law § 569–c. 1 (McKinney 1982).

By 1972, the basic structure for the mandatory sharing of TBTA operating surpluses was in effect. Section 1219–a(2)(b) of the Public Authorities Law mandated that such transfers to the Transit Authority and the commuter railroads be made:

> Promptly upon the making of the certification of its operating surplus, if any, for its fiscal year ending December thirty-first,

nineteen hundred seventy-two and for each of its subsequent fiscal years, [TBTA] shall transfer such operating surplus as follows: (i) twenty-four million dollars plus fifty percentum of the balance of such operating surplus to the [TA] solely for application to the payment of its expenses of operation, and (ii) the remainder to metropolitan transportation authority solely for application to the payment of its operating expenses and the operating expenses of commuter railroads operated by it. . . .

N.Y.Pub.Auth.Law § 1219–a(2)(b) (McKinney 1982).

Since 1972, the TBTA has contributed surplus toll revenue to MTA for the New York City bus and subway system and to the commuter railroads serving New York City and the surrounding counties. Those revenues supplement fares and support capital improvements for these mass transit systems.

During the MTA's first Five–Year Capital Plan, tolls on TBTA major facilities (the Verrazano–Narrows, Triborough, Bronx–Whitestone and Throgs Neck Bridges and the Queens–Midtown and Brooklyn–Battery Tunnels) were increased three times. The undiscounted rate for passenger cars was raised to $1.25 in 1982, to $1.50 in 1984 and to $1.75 in 1986. During the second Five–Year Plan, two projected toll increases for January 1989 and January 1991 were combined into one toll increase to $2.50 effective July 16, 1989. The most recent increase, effective January 31, 1993, raised the undiscounted crossing rate for the major facilities to $3.00, except for the residency exemption described below.

Because the Verrazano–Narrows Bridge is Staten Island's one direct physical link to New York City, Staten Island residents have been granted three separate kinds of discounts. First, prior to the January 31, 1993 toll increase, Staten Island residents could purchase resident discount tokens for 20% less than the standard toll. Staten Islanders using resident tokens therefore paid $4.00 round trip, rather than the $5.00 toll paid by non-residents. Second, when the toll increase became effective on January 31, 1993, Staten Island residents were exempt from the increase. Staten Islanders using resident discount tokens currently pay the same $4.00 toll they have paid since in July, 1989. Third, Staten Islanders can participate in the resident car pool program which offers a 75% discount to Staten Island residents who have at least three people (including the driver) in the car. Staten Islanders who car pool pay $1.25 round trip. The $1.25 car pool toll has remained the same since the prior toll increase in July 1989 and has not been increased.

While the intracity commutation costs for those travelling to and from Staten Island remain high in comparison to the cost of travel to and from many other parts of New York City, the cost for those residents of Staten Island using the Verrazano–Narrows Bridge at the available discounts are less than for those who use public transportation. Notwithstanding these efforts to accommodate the special needs of Staten Island residents who are forced to use the Verrazano–Narrows Bridge on a regular basis, plaintiffs argue that the toll is unjust and unreasonable solely because it is used to subsidize the mass transportation components of the MTA. They rely on 33 U.S.C. § 508, which provides that tolls on bridges constructed pursuant to the General Bridge Act of 1946, the Bridge Act of 1906, and the International Bridge Act of 1972, shall be just and reasonable. 33 U.S.C. § 508 (1988).

### Discussion

The threshold issue in this case is whether Section 508 should not be applied to tolls on intracity bridges, such as the Verrazano–Narrows Bridge, even though they come within its literal language. Resolution of this issue requires an analysis of the regulation of tolls by Congress, including tolls over intracity bridges such as the Verrazano–Narrows Bridge, prior to the adoption of section 508 in 1987.

The Verrazano–Narrows Bridge was constructed pursuant to the General Bridge Act of 1946 which set out the procedure for obtaining administrative approval for the construction of any bridge over "the navigable waters of the United States," 33 U.S.C § 525(a) (1988). It also limited specifically

the use of tolls collected on "interstate bridges" for bridge related purposes, 33 U.S.C.A. § 529 (1986) (repealed 1987), and mandated that the tolls on such bridges be "just and reasonable." 33 U.S.C. § 526 (repealed 1987). The Secretary of Transportation was granted authority to prescribe reasonable rates of toll for transit over the bridge. 33 U.S.C.A. § 526 (1986) (repealed 1987).

While the construction of the Verrazano–Narrows Bridge over the "navigable waters" of the United States required the consent of the Secretary of Transportation, the tolls on the bridge were not subject to any regulation because it was not an "interstate bridge." 33 U.S.C.A. § 526 (1986) (repealed 1987). Similar exemption from such toll regulation was enjoyed by all of the toll bridges operated by the MTA because of the intrastate nature of these facilities. Indeed, except for the Throgs Neck Bridge which was also constructed pursuant to the General Bridge Act of 1946, the five other toll bridges operated by the MTA were constructed pursuant to section 9 of the Rivers and Harbors Appropriation Act of 1899.

Section 9, as originally enacted, required the approval of the United States Chief of Engineers and the Secretary of War for bridges constructed "under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State...." Rivers and Harbors Appropriation Act of 1899, ch. 425, § 9, 30 Stat. 1151 (1899) (current version at 33 U.S.C. § 401 (1988)). While the approval of Congress was required for other bridges over the navigable waters of the United States, none of the bridges constructed pursuant to section 9 were initially subject to the requirement that their tolls be just and reasonable. When Congress did act to so limit the tolls on these bridges, it expressly exempted intrastate bridges of the kind constructed by the TBTA pursuant to section 9 of the Rivers and Harbors Appropriation Act of 1899. 33 U.S.C.A. § 503 (1986) (repealed 1987).

Accordingly, the intracity toll bridges operated by the MTA enjoyed a freedom from regulation that was denied to the interstate bridges operated by the Port Authority of New York. Unlike the MTA bridges, the four Port Authority bridges were constructed pursuant to the Bridge Act of 1906, 33 U.S.C. § 491, which required that tolls on such bridges be "reasonable and just" and empowered the Secretary of Transportation "to prescribe the reasonable rates of toll." 33 U.S.C.A. § 494 (1986) (current version at 33 U.S.C. § 494 (1988)).[1] A party aggrieved by a toll increase on those bridges and on other interstate bridges was required to file an administrative complaint with the Federal Highway Administrator to whom the Secretary of Transportation had delegated his regulatory authority. The decision of the Federal Highway Administrator could be challenged either in a district court, pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq., *Automobile Club of New York, Inc. v. Cox,* 444 F.Supp. 174, 175 (S.D.N.Y. 1978), *aff'd,* 592 F.2d 658 (2d Cir.1979), or in the court of appeals for the judicial circuit in which any portion of the bridge was located. *See* 33 U.S.C.A. § 505 (1986) (repealed 1987).

The Surface Transportation and Uniform Relocation Assistance Act of 1987 eliminated all administrative review of bridge tolls by the Department of Transportation. The purpose of this change, as set forth in an analysis of an earlier proposal, was to eliminate federal regulation of bridge tolls:

> States and toll authorities would be given greater flexibility in operating toll facilities. Federal oversight of the reasonableness of tolls has proven to be administratively burdensome, legally unproductive, and has interjected the Federal Government in the role of a mediator in disputes which could more appropriately be settled at the State and local level.

*Section-by-Section Analysis of S.312—Essential Highway Reauthorization Amendments of 1987,* 133 Cong.Rec. S778 (1987) (January 14, 1987).

The legislation, as originally proposed, would have eliminated the entire regulatory

---

1. See *City of Burlington v. Turner,* 336 F.Supp. 594, 605 (S.D.Iowa 1972), *modified,* 471 F.2d 120 (8th Cir.1973) for a discussion of the various statutory schemes for the regulation of tolls.

scheme and would have repealed the requirement which was found in at least three separate sections of the law, 33 U.S.C. §§ 494, 503 and 526, that bridge tolls be just and reasonable. The legislation also proposed the repeal of 33 U.S.C. § 529, which required that tolls on interstate bridges constructed pursuant to the General Bridge Act of 1946 be used solely for bridge related purposes. While the legislation ultimately enacted did eliminate all administrative oversight by the Department of Transportation and repealed sections 494, 503, 526 and 529, it added a new section 508, which provided that tolls for any bridges constructed under the Bridge Act of 1906, the General Bridge Act of 1946, and the International Bridge Act of 1972, "shall be just and reasonable." 33 U.S.C. § 508 (1988).

Section 508 did not include within its ambit any of the five MTA toll bridges that were constructed pursuant to section 9 of the Rivers and Harbors Appropriations Act of 1899. On the other hand, the inclusion of bridges constructed pursuant to the General Bridge Act of 1946, without differentiating between interstate bridges that had been previously subject to regulation and intrastate bridges that had been exempt from such regulation, had the effect of making the Verrazano–Narrows and Throgs Neck bridges subject for the first time to the requirement that the tolls on these facilities be just and reasonable.

This result was obviously unintended. Specifically, the House Conference Report explained that section 508 embodied a Senate amendment that *"removes Federal regulation and review of toll increases on certain toll bridges.* Toll increases on *these* deregulated facilities must be just and reasonable but will not be subject to review by DOT." H.R.Conf.Rep. No. 27, 100th Cong., 1st Sess. 175, *reprinted in* 1987 U.S.C.C.A.N. 66, 159 (emphasis supplied).[2]

This explanation suggests plainly that the just and reasonable limitation contained in section 508 was intended to apply only to tolls on bridges that had been subject previously to "Federal regulation and review of toll increases." What apparently occurred in the legislative process was that, in including bridges constructed under the authority of the General Bridge Act of 1946, the drafters of section 508 overlooked the fact that only interstate bridges constructed under the authority of the 1946 Act had been subject to regulatory oversight by the Department of Transportation and to the requirement that tolls be just and reasonable.

If section 508 is read literally to include intrastate bridges such as the Verrazano–Narrows Bridge and the Throgs Neck Bridge, it will mean that different bridges over the same river in the same city will be subject to different toll restrictions. As an example, tolls on the Throgs Neck Bridge will be subject to the just and reasonable requirement. By contrast tolls on the Bronx Whitestone Bridge, which is only two miles away and runs parallel to the Throgs Neck Bridge, will be immune from the statutory mandate and from the heavy hand of federal judicial review of such tolls.

Under these circumstances, there is ample authority to construe Section 508 as applying only to tolls on bridges constructed pursuant to the General Bridge Act of 1946 that had previously been subject to federal regulation. As Judge Friendly has written:

> [I]f giving the words of the statute their natural significance 'leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail.'

*United States v. National Marine Engineers' Beneficial Association,* 294 F.2d 385, 391 (2d Cir.1961), quoting *Ozawa v. United States,* 260 U.S. 178, 194, 43 S.Ct. 65, 67–68, 67 L.Ed. 199 (1922). See *Bob Jones University v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025–26, 76 L.Ed.2d 157 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on

---

**2.** The report was also presented to the Senate.

133 Cong.Rec. § 3480 March 19, 1987.

that language would defeat the plain purpose of the statute"); *Lewis v. Grinker,* 965 F.2d 1206, 1215 (2d Cir.1992); Charles B. Nutting & Shelden D. Elliott, *Legislation* 309 (1964) ("the courts are somewhat more willing to *exclude* from a statute's ambit those things literally but obviously not intentionally embraced than to *include* those which are, with equal obviousness, inadvertently omitted").

This is not the only potential threshold impediment to plaintiffs' complaint. There is also a serious question whether a private cause of action lies under section 508. Section 508 not only fails to create explicitly such a cause of action, it also lacks the kind of "right- or duty-creating language" that "has generally been the most accurate indicator of the propriety of implication of a cause of action." *Cannon v. University of Chicago,* 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 1954 n. 13, 60 L.Ed.2d 560 (1979); *see also California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). The Supreme Court has also been "especially reluctant to imply causes of actions under statutes [such as section 508] that create duties on the part of persons for the benefit of the public at large". *Cannon v. University of Chicago,* 441 U.S. at 690, n. 13; 99 S.Ct. at 1954, n. 13. Indeed, among the examples of such statutes cited in *Cannon* are two that are virtually identical to section 508. *Id.* at 693, 99 S.Ct. at 955 citing *T.I.M.E. Inc. v. United States,* 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959) ("duty of every common carrier to … establish … just and reasonable rates …"); *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951) (similar duty of gas pipeline companies).

While the Court of Appeals has entertained jurisdiction of a private cause of action under 33 U.S.C. § 508, *see Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,* 887 F.2d 417 (2d Cir.1989), it did so without discussion of the issue in a case in which the challenge was to tolls on the previously regulated interstate bridges between New York and New Jersey. Implying such a cause of action here is not only inconsistent with the congressional purpose of "removing Federal regulation and review of increases on certain toll bridges,"

but would occupy an area traditionally the concern of state law—the regulation of tolls on intrastate bridges constructed without federal aid. Under these circumstances, there is a compelling argument to be made that a private cause of action should not be implied. See Robert H.A. Ashford, *Implied Causes of Action Under Federal Laws: Calling the Court Back to Borak,* 79 Nw. U.L.Rev. 227, 313–41 (1984).

Moreover, many of these same considerations, combined with the significant discretion section 508 vests in toll bridge operators, also militate against plaintiffs' suggestion that a cause of action lies pursuant to 42 U.S.C. § 1983. *See Sutter v. Artist M.,* —— U.S. ——, ——, 112 S.Ct. 1360, 1368, 118 L.Ed.2d 1 (1992); *Marshall v. Switzer,* 10 F.3d 925, 927, (2d Cir.1993). Indeed, even under prior law, judicial review was limited to determining whether the Federal Highway Administrator abused his discretion in regulating toll increases. *Automobile Club of New York v. Cox,* 592 F.2d at 658, 664 (2d Cir.1979).

■ There is no need to resolve these threshold issues, however, because plaintiffs have failed to create even a triable issue of fact on their claim that the challenged toll increases on the Verrazano–Narrows Bridge are unjust and unreasonable. Specifically, in the absence of legislation to the contrary, the pre–1987 requirement that tolls be just and reasonable did not preclude the operator of a bridge from imposing tolls sufficient to generate a fair profit or return. *City of Burlington v. Turner,* 471 F.2d 120, 123 (8th Cir.1973). If the tolls on such a facility were not greater than necessary to provide such a return, they were not subject to challenge because of the manner in which they were calculated. *Cf. Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) (applying this rule in utility rate case); *Automobile Club of New York, Inc. v. Cox,* 592 F.2d 658, 668–69 (2d Cir.1979) (suggesting applicability of this rule in bridge toll case). In 1987, Congress eliminated any doubt as to the continued viability of this rule when it re-

pealed the only statutory exception to it, Section 506 of the General Bridge Act of 1946, 33 U.S.C. § 529, which had expressly limited the use of toll revenues to bridge-related purposes on interstate bridges constructed after 1946. *See id.* at 664–65.

The defendants in this case have submitted evidence in support of their cross-motion for summary judgment that demonstrates that the toll increases on the Verrazano–Narrows Bridge do not exceed the rate necessary to provide a reasonable return or profit based on one of the generally accepted methods for making such determinations. (Affidavit of Gary G. Caplan, Budgets Director of the M.T.A., at ¶ 48). The failure of plaintiffs to counter this evidence, combined with their failure to allege in their complaint that the toll rates exceed that necessary to generate a reasonable profit or rate of return, is sufficient to justify an order granting the defendants' cross-motion for summary judgment. This is not the only basis, however, for granting such relief.

█ The law has long been settled that, "under appropriate circumstances, a toll producing more than a fair rate of return may be just and reasonable." *Automobile Club of New York v. Cox,* 592 F.2d at 667. Specifically, if a bridge toll generates more revenue than necessary to provide a fair profit or rate of return, the toll may not be challenged successfully if it is used to support a single integrated transportation system in which the successful operation of the bridge is dependent in whole or part on the operation of the other related facilities. Simply stated, it is just and reasonable for those who use a bridge to pay a toll that may be used to subsidize the system-wide operation of other transit facilities from which they benefit. *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,* 706 F.Supp. 264, 276 (S.D.N.Y.1989), *aff'd,* 887 F.2d 417 (2d Cir.1989) ("those Port Authority activities which represent efforts to improve the quality and quantity of its services system-wide ... may be included in the Port Authority's rate base.").

Particularly apposite is *Automobile Club of New York, Inc. v. Cox,* 592 F.2d 658 (2d Cir.1979). The Court of Appeals there held that the Port Authority of New York and New Jersey had not violated the just and reasonable standard by fixing tolls on the various bridges within its jurisdiction in a manner sufficient to absorb part of the cost of operating the Lincoln and Holland Tunnels, the Port Authority Bus Terminal and the PATH commuter line. *Id.* at 669, 670, 672–73. In so doing, the Court of Appeals held that bridge tolls could be used to subsidize non-bridge facilities operated by the Port Authority because there was a legislative finding, which "is entitled to substantial deference," *Id.* at 670, that the bridges and tunnels should be considered as a single operating group *and* because the subsidized non-bridge operations either alleviated traffic on the bridges by providing an alternative means of crossing into New York City from New Jersey or facilitated the use of such alternative means.

The Court of Appeals did suggest that the use of Port Authority bridge tolls to cover the large deficits of the PATH commuter line was problematic because there was no legislative finding that PATH and the bridges and tunnels should be considered as a group and because there was little evidence to suggest that PATH provided a significant alternative means of transportation for those who used the bridges. Nevertheless, the Court of Appeals concluded, without finally resolving the issue, that the Federal Highway Administrator did not act arbitrarily and capriciously in upholding the subsidy for PATH. *Id.* at 673.

The legislative history of the 1987 change in the law is significant because it suggests approval of the holding in *Cox.* Of particular significance is the following expression of intent in the House Conference Report accompanying the Surface Transportation and Uniform Relocation Assistance Act of 1987:

Th[e] just and reasonable requirement is not intended to interfere with or in any way restrict existing authority granted to multi-modal transportation agencies, such as the Port Authority of New York and New Jersey, that operate bridges along with other facilities to use bridge toll revenues for non-bridge purposes or the pooling or combination of the revenues from all of their facilities.

H.R.Conf.Rep. No. 27, 100th Cong., 1st. Sess. 175, *reprinted in* 1987 U.S.C.C.A.N. 66, 159.

Subsequently, notwithstanding "[t]he absence of specific statutory authorization to include PATH in the rate base for [the interstate] bridges" operated by the Port Authority, *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,* 706 F.Supp. at 276, and the undisputed evidence that the bridge crossings and the PATH commuter lines were not "normally used interchangeably", the Court of Appeals rejected a renewed claim that it was unfair and unjust for the Port Authority to fix the tolls on the bridges linking New York City and New Jersey at rates necessary to subsidize the operation of the PATH commuter line. *See Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,* 887 F.2d 417, 422 (2nd Cir.1989).

Specifically, by 1989 traffic was strained to capacity on the interstate toll crossings. Although the PATH commuter line diverted commuters from the Lincoln and Holland Tunnels rather than the toll bridges, traffic on the far removed George Washington Bridge and on the Staten Island/New Jersey crossings would increase somewhat without the PATH commuter line. This attenuated functional relationship, when viewed against the backdrop of the House Conference Report, provided a sufficient basis to sustain the toll subsidy for the PATH commuter line. *Id.* at 425 ("We agree with Judge Pollack that this [legislative history] gives the Port Authority some flexibility which could extend to including PATH in the rate base with the bridges and tunnels.").

■ This is a far more compelling case than PATH for staying federal judicial intervention. Unlike the four interstate bridges operated by the Port Authority, the tolls of which had always been subject to extensive federal regulation, the Verrazano–Narrows Bridge and the other bridges operated by the MTA are intracity bridges. Their tolls have never been subject to federal regulation. Even if the literal language of 33 U.S.C. § 508 now subjects tolls on some of these intracity bridges to such regulation, and even if plaintiff may sue to enforce compliance with it, there are sound reasons of policy for according "substantial deference" to the findings of the State of New York that these intracity bridges are part of a single integrated transportation system, *see Automobile Club of New York, Inc. v. Cox,* 592 F.2d at 670, and that the cost of the operation of the mass transportation facilities of the MTA be included in the rate base for the tolls on the bridges and tunnels. Indeed, the circumstances that led to the creation of the MTA, which have been summarized earlier, provide ample support for the conclusion that, even though the Verrazano–Narrows Bridge is not normally used interchangeably with many of the other component parts of the MTA, the Bridge is part of a single integrated transportation system.

Nevertheless, plaintiffs argue that, because the mass transportation systems in New York City and its suburbs do not provide an alternative to the use of the Verrazano–Narrows Bridge, they do not contribute to reducing congestion on the Bridge. Under these circumstances, those who pay the tolls do not derive any benefit from the mass transit facilities they subsidize. This argument fails because the commuter rail facilities that serve the eastern and northern suburbs of New York City, along with the subways and buses in New York City, effectively reduce traffic on the same arteries, river crossings and streets that are used by commuters from Staten Island who use the Verrazano–Narrows Bridge. As one of the defendants' uncontroverted supporting affidavits makes clear:

> The highways, roads, bridges and tunnels in the metropolitan region would be choked with traffic in the absence of an effective public transportation system. Driving on our already crowded roadways would be slower, more difficult and more subject to traffic incidents and delays. For example, if all Staten Island commuters drove their cars on the Verrazano–Narrows Bridge, rather than taking public transportation to and from the ferry or NYCTA express buses, the Bridge would likely become severely congested. And if other commuters were driving to the Central Business District in Manhattan rather than taking commuter trains, buses and

subways from the other boroughs, the roadways in Brooklyn and Manhattan would be impassable.

(Affidavit of David Judd, Manager of Marketing and Business Development for the Transportation Operations Coordinating Committee ("TRANSCOM"), at ¶ 9). Those who pay the tolls on the Verrazano–Narrows Bridge benefit from the subways, buses and the commuter rail lines because, without those facilities, it would become increasingly more difficult, if not impossible, for them to commute once they crossed the Narrows.

Viewed in this way, even the LIRR and Metro–North—the commuter lines that plaintiffs argue specifically should not be subsidized by users of the Verrazano–Narrows Bridge—are functionally related to the Bridge. The LIRR transports approximately 106,000 people per day. These riders represent 18% of all the commuters arriving in Manhattan from Queens as well as Nassau and Suffolk counties. (See Toll Increase Report, Defendants' Exhibit A, at 5 [hereinafter Toll Increase Report]). A mere "10% shift ... of [Queens] Corridor commuters to auto would add more than 29,000 cars a day to the highway network." Id. Similarly, the record indicates that Metro–North transports approximately 85,000 passengers into Grand Central Station per day, more than one-quarter of all commuters arriving from the Bronx Corridor. See Toll Increase Report, at 4. Of these, 65,000 arrive during the morning rush hour alone. Id.

An influx of vehicular traffic from the north and east, which would result from a shutdown of the LIRR and Metro–North, would further clog traffic on the streets and roadways of Manhattan, from mid-town to the Wall Street area of lower Manhattan. Such an influx would also increase the traffic on the Brooklyn Bridge and the Battery Tunnel that are used by commuters from Staten Island and by those who commute from Long Island and the northern suburbs to lower Manhattan.[3] Indeed, the 1983 LIRR strike "increased the rush-hour congested period at East River Crossings by

nearly an hour." Id. at 6. Moreover, one of the arterial approaches to those crossings from Queens and Long Island is the Belt Parkway, a roadway onto which traffic from the Verrazano–Narrows Bridge exits on its way to Manhattan. This additional traffic resulting from a shutdown of the LIRR and Metro–North would make life even more difficult for those commuters making their way from Staten Island, both before and after they enter Manhattan.

Finally, while the foregoing discussion has focused on the effect on travel to Manhattan Island from Staten Island if the commuter railroads were not available, it should not be forgotten that the Verrazano–Narrows Bridge also serves as a bypass that "enables traffic to and from New England and points south of the city to avoid crowded Manhattan Island." Caro, The Power Broker, at 342. This bypass would become a far less attractive alternative if the roads leading through Brooklyn, Queens, the Bronx and Westchester were crowded with commuters who use Metro–North and the LIRR.

It is of no consequence that all of these adverse effects will result not from increased traffic on the Bridge, but from traffic congestion on the arteries onto which the bridge traffic flows and on the streets and highways in Manhattan, Brooklyn, Queens and points north. The success and utility of toll facilities has always been dependent upon the adequacy and convenience of the approaches and connecting highways, even those at some distance from the toll facility. Caro, The Power Broker, at 924. Indeed, from the very beginning, the Legislature empowered the TBTA to acquire land to construct not only approaches to its toll bridges, but "new roads, streets, parkways or avenues, connecting with the approaches" and to widen existing roads, streets, parkways or avenues connecting with those approaches. N.Y.Pub. Auth.Law, § 553(10)(a) (McKinney 1982). Similarly, legislation authorizing the construction of the Verrazano–Narrows Bridge explicitly empowered the TBTA to provide for construction "of new parks, parkways,

---

3. Those commuting from the northern suburbs to lower Manhattan cross the Whitestone and Throgs–Neck Bridges into Queens and then come

into Manhattan over one of the lower East River crossings. Toll Increase Report, at 4.

highways, or improvements to existing parks, parkways or highways, either connecting directly or indirectly with the Narrows bridge project, for the purpose of attracting or facilitating traffic or improving approaches to and connections with such project...." N.Y.Pub.Auth.Law § 553–a(1)(b) (McKinney 1982).

The Verrazano–Narrows Bridge was not constructed simply to provide a crossing from Bay Street to Bay Ridge. Anyone who has waited in stalled traffic on the Staten Island approaches to the Verrazano–Narrows Bridge or encountered delays in exiting onto the Belt Parkway, or on the approach to the Brooklyn Bridge or the Battery Tunnel a few miles beyond, or on the clogged streets of lower Manhattan, understands that those charged with facilitating the flow of traffic from Staten Island to the rest of New York City and its suburbs will fail altogether if they devote their resources solely to maintaining the Bridge and ignore the needs of alternate transportation facilities that make it possible for those who use the Verrazano–Narrows Bridge to get to their destinations without undue delay.

Plaintiffs do not seriously challenge this conclusion. Nor have they offered any competent evidence on this issue. Instead, they rely solely on the erroneous legal premise that tolls may be used to subsidize only those mass transportation facilities that provide an alternative to the use of the Verrazano–Narrows Bridge. Even on this score, however, uncontroverted evidence submitted by the MTA demonstrates that some of the subsidized mass transportation facilities operated by the MTA, particularly those in Staten Island and the City of New York, do encourage commuters to avoid driving their automobiles over the Verrazano–Narrows Bridge to get to work in the City of New York.

The Verrazano–Narrows Bridge is the only direct physical link between Staten Island and the rest of New York City.[4] Of the approximately 47,000 average-weekday trips that originate in Staten Island and end in Manhattan, 49%, or 23,000 trips, are transit-based. TA express buses using either the Verrazano–Narrows Bridge or the Brooklyn Battery Tunnel provide the largest share of these public transportation trips. Nineteen express bus routes link all parts of Staten Island with Manhattan. In addition, twenty-three local bus routes provide service within the Island, with two lines offering connections to subway service in southern Brooklyn. While the buses to Brooklyn and Manhattan use the Verrazano–Narrows Bridge, they benefit the users of the Bridge by reducing the overall volume of automobile traffic on it. See *Automobile Club of New York, Inc. v. Cox*, 592 F.2d at 670; Caro, *The Power Broker*, at 944.

Moreover, this is not the only way in which subsidized public transportation facilities make possible a viable alternative to automobile traffic across the Bridge. The SIRTOA rail line, one of the beneficiaries of toll subsidies, connects the Staten Island Ferry to twenty-one stations along the south shore, and schedules are designed to facilitate transfers with arrivals and departures of the Staten Island Ferry. Once commuters get off the Ferry in Manhattan, the subways and buses operated by the NYCTA provide the means by which they can make their way to other parts of Manhattan and the outer boroughs.

Any disruption or cutback in subsidized transit services and improvements will increase traffic on the Verrazano–Narrows Bridge and make it more difficult for all users of the Bridge to commute into Brooklyn and Manhattan. During a 1980 transit strike, disruptions in bus and subway service led to an increase in the share of Staten Island trips made by auto from 31% to 45%, and a drop in transit's share from 69% to 40%. The effect of such a shutdown today would be further complicated by severe bottlenecks on the overcrowded Staten Island Expressway and the Verrazano–Narrows Bridge. Moreover, any additional auto volume caused by a shift in travel from transit

---

4. Other transportation options between Staten Island and Manhattan Island are limited to using the Staten Island Ferry, which no longer carries autos during peak hours, or a Port Authority crossing into New Jersey followed by reentry into New York through one of the Hudson River crossings.

to auto would exacerbate existing traffic problems in the Brooklyn Corridor, because virtually all trips made across the Verrazano–Narrows Bridge are funneled into the Belt Parkway and the Gowanus Expressway. This added congestion would also come at a time when the Gowanus Expressway is under reconstruction. Lane closures are planned throughout the life of the project (through the year 2000). As a result, vehicular congestion will rise on the highway, and could be exacerbated even further if currently available transit services cannot be provided.

The clear functional relationship between the Verrazano–Narrows Bridge and the subsidized mass transit facilities operated by the MTA in Staten Island and in the rest of the City of New York—a relationship that the plaintiffs no longer appear to challenge seriously—provides yet another hurdle to plaintiffs even if they are correct in arguing that no such relationship exists between the Verrazano–Narrows Bridge and the commuter rail lines. The Verrazano and Throgs Neck bridges are the only two MTA bridges that are arguably subject to the just and reasonable requirement of Section 508. Even if plaintiffs prevail in their argument with respect to the use of Verrazano–Narrows Bridge tolls to subsidize these commuter rail lines, it is difficult to see how they would be entitled to any relief other than a bookkeeping change. The subsidy to the mass transit facilities operated by the MTA on Staten Island and in the other boroughs of the City of New York exceeds the operating surplus generated by the Verrazano–Narrows Bridge. (*See* Defendants' Letter Submission of December 1, 1993). Under these circumstances, plaintiffs would have no basis to complain if the MTA simply allocated the surplus from the Verrazano–Narrows Bridge to its mass transit facilities in the City of New York and used the surpluses from its other bridges and tunnels to provide the subsidy for Metro–North or the Long Island Railroad.

Plaintiffs' remaining arguments are without merit. Only one requires a brief response. This argument is based on the mandate that the TBTA transfer a large percentage of its toll surplus to the MTA "solely for application to the payment of its operating expenses and the operation expenses of commuter railroads operated by it...." N.Y.Pub.Auth.Law § 1219–a(2)(b) (McKinney 1982). Plaintiffs argue that because "both the Metro–North and LIRR components of the so-called 'system' are, and have been for some time, profit-making ventures," the mandatory transfer of surplus to these entities operates "to the direct detriment of TBTA facility users, who are required to pay exorbitant tolls to provide funding for ventures which are already profitable." Plaintiff's Memorandum of Law in Opposition to Defendant's Cross–Motion for Summary Judgment, at 9–10.

This argument fails, if only because plaintiffs have not come forward with any evidence to support their suggestion that the commuter railroads are "profit-making ventures." By contrast, defendant's submission shows that as of 1991, Metro–North and the LIRR were operating at a $130 million deficit. *See* Toll Increase Report, at 32. Moreover, it is significant to note that this sizable deficit *includes* the TBTA statutory subsidy. *Id.* Absent a showing of profitability, plaintiff's argument cannot be sustained.

Accordingly, for the preceding reasons, defendants' motion for summary judgment is granted and plaintiffs motion for summary judgment is denied.

SO ORDERED.