

**2006 Decisions**

**Opinions of the United States Court of Appeals for the Third Circuit**

8-17-2006

# Amer Trkng Assn Inc v. DE River Joint Toll

Precedential or Non-Precedential: Precedential

Docket No. 05-1650

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Amer Trkng Assn Inc v. DE River Joint Toll" (2006). *2006 Decisions*. Paper 518.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/518

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1650

———

AMERICAN TRUCKING ASSOCIATIONS, INC.;
THE PENNSYLVANIA MOTOR TRUCK ASSOCIATION;
THE NEW JERSEY MOTOR TRUCK ASSOCIATION;
ROADWAY EXPRESS,
                                        Appellants

v.

DELAWARE RIVER JOINT TOLL BRIDGE COMMISSION

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cv-08841)
District Judge: Honorable Ronald L. Buckwalter

———

Argued March 2, 2006

Before: SLOVITER, FUENTES, Circuit Judges,
and RESTANI,[*] Judge

(Filed: August 17, 2006)

---

[*] Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

Richard L. Berkman
Kristin M. Hynd
David N. Sontag    (Argued)
Dechert LLP
Philadelphia, PA l9l03-2793

Robert S. Digges, Jr.
American Trucking Associations, Inc.
Alexandria, VA 22314

        Attorneys for Appellants

John F. Casey     (Argued)
Wolff & Samson PC
West Orange, NJ 07052

James M. McMaster
Smith & McMaster, P.C.
Newtown, PA l8940

Francis G.X. Pileggi
Fox Rothschild LLP
Wilmington, DE 19801

        Attorneys for Appellee

———

OPINION OF THE COURT

———

SLOVITER, Circuit Judge.

        Commercial truckers who cross the many bridges that connect New Jersey and Pennsylvania have turned to the federal courts in this action to complain that the tolls being charged on certain of those bridges are excessive.  The truckers seek to invoke federal jurisdiction under 33 U.S.C. § 508, a provision that calls for bridge tolls to be "just and reasonable."  We must decide at the threshold whether the truckers have a private right of action under § 508 to maintain this suit.  After reviewing the language of § 508 as well as the factors in Cort v. Ash, 422 U.S.

2

66 (1975), the District Court held that the truckers have neither an express nor an implied right of action, and it dismissed the suit for want of jurisdiction.

## I.

Appellants (collectively, the "Truckers") are a large-fleet trucking company (Roadway Express) and three trade associations (American Trucking Associations, Inc.; The Pennsylvania Motor Truck Association; and The New Jersey Motor Truck Association) that represent the interests of the thousands of interstate truckers who regularly cross the toll bridges at issue. Appellee is The Delaware River Joint Toll Bridge Commission (the "Commission"), which currently operates twenty bridges between New Jersey and Pennsylvania over the Delaware River. Eighteen of those bridges accommodate vehicular traffic, with seven of the eighteen being toll bridges for which the Commission sets the rates for passage.[1] The Commission was created through a bi-state compact between New Jersey and Pennsylvania with the consent of the United States Congress.[2] Its decision making is governed by ten

---

[1]The seven toll bridges are Trenton-Morrisville (US 1), New Hope-Lambertville (US 202), Interstate 78, Easton-Phillipsburg (US 22), Portland-Columbia (US 46), Delaware Water Gap (I-80), and Milford-Montague (US 206). The Commission refers to its eleven non-toll vehicular bridges as "toll supported." Appellee's Br. at 5. It explains that those bridges are mostly older and cannot be used by heavy trucking, and because toll revenue provides the sole means of support for all bridges under the Commission's jurisdiction, its non-toll bridges are supported by revenue collected on its toll bridges.

[2]Article I, § 10, Clause 3 of the United States Constitution provides in part: "No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State[.]" In 1935, Congress gave its consent to the original compact between New Jersey and Pennsylvania that created the Commission. See Act of Aug. 30, 1935, Pub. L. No. 74-411, § 9, 49 Stat. 1051, 1058 (1935).

Commissioners, five of whom are appointed by the Pennsylvania Governor and five by the New Jersey Governor with the consent of the New Jersey State Senate.  The New Jersey Commissioners serve a three-year term while the Pennsylvania Commissioners serve at their Governor's pleasure.  All Commissioners serve without compensation.  No action of the Commission is binding unless a majority of the Pennsylvania Commissioners and a majority of the New Jersey Commissioners vote in favor of it.

In December 2002, the Truckers filed this action seeking a declaration that the Commission's newly adopted toll rates – which took effect in November 2002 and were increased further in January 2004 – are not "just and reasonable."  The Truckers premised their claim upon § 508, which provides:

> Tolls for passage or transit over any bridge constructed under the authority of the Act of March 23, 1906 (34 Stat. 84; 33 U.S.C. 491-498), commonly known as the "Bridge Act of 1906", the General Bridge Act of 1946, and the International Bridge Act of 1972 shall be just and reasonable.

33 U.S.C. § 508.[3]

The facts concerning the Commission's toll increases are largely undisputed.  In December 2001, after three public hearings and a public meeting, the Commission adopted a new toll structure to fund its operations.  Among other things, the Commission planned to use increased toll revenue to fund a ten-year, $526.5 million capital-improvement program, with an allocation of the funds to bridge protection, preservation, management, and enhancement.  The new toll rates were also adopted in response to the terrorist attacks of September 11, 2001.  The Commission was advised by its insurers post-9/11 that it could no longer obtain coverage for losses caused by acts of terrorism.  The Commission thus planned to use a portion of the revenue from its new toll structure to create a $280 to $300

---

[3]The Commission does not dispute that its toll bridges fall within the purview of § 508.

4

million self-insurance fund to cover losses from acts of terrorism.

The first phase of the new toll structure took effect on November 30, 2002, when the Commission increased its truck rate from an average rate of 75¢ per axle to $2.25 per axle. As a result, "tolls for a five-axle truck, the most common commercial vehicle, went from an average of about $3.75 to $11.25." App. at 71. In the second phase of the increase, truck tolls were to rise to $3.25 per axle effective January 1, 2004.

Just prior to the second-phase increase, the Commonwealth of Pennsylvania and the State of New Jersey pledged to provide the Commission with financial assistance in the event of a terrorist attack. This pledge prompted the Commission to eliminate its planned terrorism-self-insurance fund and to adopt, in September 2003, a new toll structure as part of a revised ten-year financial plan. Under the new plan, truck tolls were increased in January 2004 to $2.75 per axle for trucks with more than two axles, which marked a reduction from the planned increase to $3.25 per axle. The $2.75-per-axle toll remains in place at present.[4]

The Truckers contend that given the elimination of the need for the terrorism-self-insurance fund, the Commission did not reduce truck tolls or its revenue commensurately, and thus the $2.75 per axle toll is not "just and reasonable" within the meaning of § 508. In particular, the Truckers cite two new expenditures that were added as part of the revised September 2003 financial plan. First, the Commission added $40 million for potential capital outlays, which the Truckers describe as a

---

[4]The Truckers do not challenge the toll charged for smaller, two-axle trucks, which is presently $5.00; their challenge is solely to the rate of $2.75 per axle for trucks with more than two axles. We note that the Commission charged truckers at a slightly reduced rate if they paid the toll electronically through the E-ZPass system. Because the Truckers do not discuss the E-ZPass rates in their pleadings, we do not consider those rates here. The Commission's rate for automobile traffic likewise need not be discussed.

5

mere subset of various non-bridge projects originally contained in a plan that the Commission earlier failed to adopt for economic and community development initiatives. Second, the Commission's September 2003 financial plan established a minimum targeted cash reserve that was to be the greater of $80 million or 15% of its then-current outstanding principal indebtedness. A 1992 bond indenture requires the Commission to maintain a minimum cash reserve equal to 20% of its annual operating budget, whereas the $80 million cash reserve sought by the Commission would be slightly over 200% of its 2004 operating budget, and slightly over 50% of its outstanding bonds in 2004. According to the parties, the Commission's minimum targeted cash balance at the end of 2003 was approximately $83 million, and was projected to be about $118 million in 2004, in addition to an approximately $12.3 million debt-service reserve.

The Commission contends that maintaining the $80 million minimum cash reserve is necessary to preserve the credit rating of its bonds and as a precaution should a catastrophic event render any of its bridges inoperable. The thrust of the Truckers' argument is that the increased tolls are not just and reasonable because they are designed mainly to build an unnecessarily large cash reserve.

After the parties conducted discovery, the Commission moved for summary judgment on the merits. The District Court denied the motion, finding that genuine issues of material fact existed as to whether the toll rate is just and reasonable within the meaning of § 508. Just prior to trial, the Commission filed what it called a "Motion in Limine," arguing for the first time that the Truckers have no private right of action under § 508. The District Court deferred a ruling on the issue, and the matter proceeded to a bench trial on the merits. The District Court conducted a post-trial oral argument at which the parties were afforded an opportunity to address whether the Truckers have a private right of action. The District Court suggested at that time that if it were to find a right of action, it would be inclined to conclude that the toll increases were not just and reasonable in view of the large cash reserve that the Commission sought to establish.

Thereafter, the District Court issued an Order dismissing the Truckers' complaint for want of jurisdiction. The District Court declined to reach the merits because it found that neither the language of § 508 nor its legislative history revealed evidence of a congressional desire to afford the Truckers a right to file suit in federal court to challenge the toll rates adopted by local officials. The Truckers timely filed this appeal. We have appellate jurisdiction under 28 U.S.C. § 1291. Whether a statute creates a private right of action is a question of law subject to plenary review. In re Corestates Trust Fee Litig., 39 F.3d 61, 63 (3d Cir. 1994).

## II.

### (a)    Mootness

The Commission first raises a mootness argument. It contends that the Truckers' expert witness conceded before the District Court that the proper per axle truck toll should be approximately $2.75 in 2006. Because the 2006 toll is $2.75, the Commission argues that the Truckers' challenge to the toll is now moot. The Truckers respond that their "position has always been and continues to be that the current toll rate of $2.75 per axle is not 'just and reasonable' as long as the Commission has an unrestricted cash reserve that is not 'just and reasonable.'" Reply Br. at 6. The Truckers explain that they seek to have the toll rate revert to $2.25 per axle until the allegedly unreasonable cash reserve ($118 million at the time of trial) is spent down to a "reasonable" level. Id. at 6-7. Although they acknowledge that their expert conceded it might be necessary to charge $2.75 per axle in 2006, the Truckers explain that this concession was plainly contingent upon the Commission adopting a proposed capital improvement plan that called for an acceleration in its spending.

"If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698–99 (3d Cir. 1996) (citations omitted). Here, there is no evidence that the Commission has

spent down its cash reserve to any degree, much less to a degree that the Truckers concede is reasonable. In addition, it is clear that the Truckers have never conceded that a $2.75 toll is reasonable absent a corresponding diminution in the Commission's cash reserve. At the post-trial oral argument, the Truckers' counsel fully expressed their position with regard to the remedy sought:

> [A]ll we're asking is that [the District Court] reinstate the $2.25 toll [and] tell the Commission that before it can raise tolls in the future it needs to spend down the reserves to a reasonable level. Once it's done that, it would be free to do whatever it needs, I mean it would be free to do a reasonable toll based on its needs at the time. And again, I think if we don't like it at that point, it's incumbent upon us to file another lawsuit.

SA at 20.

The Commission seeks support for its mootness argument in County of Morris v. Nationalist Movement, 273 F.3d 527 (3d Cir. 2001). In Morris, a declaratory judgment action was instituted to resolve constitutional questions regarding an imminent July 4 parade. Id. at 534. The district court held an expedited hearing and issued a decision "to guide the parties' conduct during that event." Id. This court dismissed the appeal as moot given that the parade was over and any dispute that might arise in connection with future July 4 activities could be resolved through a new lawsuit and the development of a new record based on the changed circumstances. Id. Here, in contrast, the toll rates and cash reserve have not changed in such a way as to prevent a court from affording the Truckers the relief they seek, which, as we understand it, is either a reversion to the $2.25 per axle toll, or a $2.75 toll accompanied by a sufficient reduction in the cash reserve. On this record, the appeal is not moot.

**(b)     Do the Truckers have a private right of action under § 508?**

The first step in a private right of action inquiry is to look

8

at the text of the statute itself to determine whether Congress has explicitly provided a right to file suit.  See Three Rivers Ctr. for Indep. Living v. Housing Auth. of Pittsburgh, 382 F.3d 412, 420 (3d Cir. 2004) ("A court must look to the text of the statute to see if it states, by its terms, that a private party may bring suit to enforce it.").  Here, the Truckers concede, as they must, that § 508 is devoid of explicit right-conferring language.  Indeed, § 508 is notable mainly for its brevity, and it contains no language that might suggest a congressional desire to allow a private suit to enforce the "just and reasonable" provision.  See Molinari v. N.Y. Triborough Bridge & Tunnel Auth., 838 F. Supp 718, 724 (E.D.N.Y. 1993) (observing that § 508 does not explicitly create private right of action).  Section 508's silence is perhaps unsurprising, as "[m]any statutes . . . do not contain provisions addressing . . . whether private parties may maintain a right of action[.]"  Three Rivers Ctr., 382 F.3d at 421.

In the absence of an explicit congressional mandate, a court must next look to Congress's intent in enacting a statute to determine whether it would be appropriate to infer a right of action for the party seeking to enforce it.  See id.  To this end, the Supreme Court has set forth four criteria to guide a court in assessing whether a private right of action can be inferred:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"–that is, does the statute create a federal right in favor of the plaintiff?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?  [Fourth,] is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Cort, 422 U.S. at 78 (citations omitted).

"Congress's intent in enacting a statute is always the 'focal point' in determining whether courts should infer a private right of action from the statute."  Three Rivers Ctr., 382 F.3d at

9

421 (quoting <u>Thompson v. Thompson</u>, 484 U.S. 174, 179 (1988)). The <u>Cort v. Ash</u> test serves to "guide a court's review in discerning that intent." <u>Three Rivers Ctr.</u>, 382 F.3d at 421 (citations omitted). Significantly, we have held that the first two factors of the test are "critical," and "[i]f they do not point toward a private right, the remaining two [factors] 'cannot by themselves be a basis for implying a right of action.'" <u>Am. Tel. & Tel. Co. v. M/V Cape Fear</u>, 967 F.2d 864, 866 (3d Cir. 1992) (quoting <u>Touche Ross & Co. v. Redington</u>, 442 U.S. 560, 580 (1979) (Brennan, J., concurring)). "This emphasis on the first two factors has severely weakened the once-prevailing view that a cause of action will be implied if existing statutory remedies are inadequate to fulfill the purpose of the statute." <u>Id.</u> at 867.

    1.  Are the Truckers "one of the class for whose especial benefit [§ 508] was enacted"?

The District Court determined that the Truckers "[a]t first blush" seem to satisfy the first <u>Cort v. Ash</u> factor with respect to the benefit conferred by § 508. App. at 10. The Court concluded, however, that § 508 is "simply [] of a general proscriptive character without a clear and unmistakable focus on the benefitted class." App. at 12. The Truckers argue that the District Court erred in its analysis because § 508 was enacted to benefit anyone who uses the toll bridges subject to § 508's terms. The Commission responds that commercial truckers and the organizations representing their interests are neither expressly nor even impliedly the subject of an especial benefit under § 508.

In considering whether § 508 creates a federal right in favor of the Truckers, we must follow the instructions of the Supreme Court that we "look[] to the language of the statute itself." <u>Cannon v. Univ. of Chicago</u>, 441 U.S. 677, 689 (1979). "The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." <u>California v. Sierra Club</u>, 451 U.S. 287, 294 (1981). In other words, the statutory text "must be 'phrased in terms of the persons benefitted.'" <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284 (2002) (quoting <u>Cannon</u>, 441 U.S. at 692 n.13).

10

As we stated above, the language of § 508 gives no express indication of a desire to create a right of action to enforce the "just and reasonable" standard, nor is there any mention of a remedy for non-compliance. Moreover, there is no suggestion in the language as to whom Congress intended to benefit by enacting the statute, much less any indication that Congress wished to confer federal rights upon any beneficiary in particular. The statute simply directs that toll authorities charge "just and reasonable" rates.

There can be little doubt that the public at large benefits from a requirement that interstate bridge tolls remain just and reasonable, and that benefit certainly extends to truckers who haul goods in interstate commerce. The Supreme Court, however, "has been especially reluctant to imply causes of action[ ] under statutes that create duties on the part of persons for the benefit of the public at large." Cannon, 441 U.S. at 692 n.13; see also M/V Cape Fear, 967 F.2d at 867 (explaining that "when a statute imposes a duty without an 'unmistakable focus' on the benefitted class, the courts are reluctant to infer a remedy"). The duty that § 508 places upon toll officials has no focus "on any particular class of beneficiaries whose welfare Congress intended to further." Sierra Club, 451 U.S. at 294. We thus agree with the District Court that the first Cort v. Ash factor weighs against the finding of a private right of action under § 508.

2. Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

A. Legislative History

Our consideration of the second Cort v. Ash factor leads us to § 508's legislative history, which we will review in some detail before returning to the Truckers' arguments on appeal.[5]

_____

[5] We recognize that Justice Scalia has expressed disapproval of judicial inquiry into legislative history. See, e.g., Blanchard v. Bergeron, 489 U.S. 87, 98-99 (1989) (Scalia, J.,

11

Many, if not all, of the Commission's toll bridges were apparently constructed in accordance with the Bridge Act of 1906. See Act of March 23, 1906, Pub. L. No. 59-65, Chap. 1130, 34 Stat. 84 (1906) (codified as amended at 33 U.S.C. §§ 491-98). Under that Act, Congress granted the Secretary of War and the Chief of Engineers authority to regulate the construction of bridges over the navigable waters of the United States. Id. Section 4 of the Bridge Act of 1906 further provided that "[i]f tolls shall be charged for the transit over any bridge constructed under the provisions of this Act . . . such tolls shall be reasonable and just[.]" Id. § 4. In addition, § 4 provided the Secretary of War with authority "at any time, and from time to time, [to] prescribe the reasonable rates of toll for such transit over such bridge, and the rates so prescribed shall be the legal rates and shall be the rates demanded and received for such transit." Id. Consequently, tolls for bridges governed by the Bridge Act of 1906 were originally set at the federal level, not by local authorities such as the Commission.

In 1935, Congress passed additional legislation providing that tolls over any bridge crossing the navigable waters of the United States shall be "just and reasonable," although this new legislation was not applicable to, inter alia, bridges subject to the provisions of the Bridge Act of 1906, which, as noted, provided for tolls to be set at the federal level. See Act of Aug. 21, 1935, Pub. L. No. 74-296, § 1, 49 Stat. 670, 670 (1935), repealed by Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 135(d), 101 Stat. 132, 174 (1987) (the "1935 Act"). The 1935 Act authorized the Secretary of War, "either upon complaint or upon his own initiative," to conduct an inquiry into whether any toll charged by local authorities violated the "just and reasonable" provision of the 1935 Act. Id. § 2. If a toll violated the Act, the Secretary could

concurring) (opining that "it is [not] compatible with our judicial responsibility . . . to give legislative force to each snippet of analysis, and even every case citation, in committee reports that are increasingly unreliable evidence of what the voting Members of Congress actually had in mind"). The history we discuss here is compelled by the second Cort v. Ash factor.

12

prescribe the reasonable toll to be charged.  Id.  The 1935 Act further provided for judicial review of any order of the Secretary by the filing of a petition for review in either the District of Columbia Court of Appeals or the Court of Appeals for the Circuit in which the bridge in question was wholly or partly located.  Id. § 3.

Congress thereafter passed the General Bridge Act of 1946, which granted Congressional consent for the construction of bridges over navigable waters upon approval of the construction by local and federal authorities.  See Legislative Reorganization Act of 1946, Pub. L. No. 79-601, tit. V, 60 Stat. 812, 847 (1946) (codified as amended at 33 U.S.C. §§ 525-34).  Like the Bridge Act of 1906, § 503 of the General Bridge Act of 1946 provided that tolls over such bridges "shall be reasonable and just," and that the Secretary of War may "prescribe the reasonable rates of toll for such transit over such bridge, and the rates so prescribed shall be the legal rates and shall be the rates demanded and received for such transit."  Id. § 503, repealed by § 135(e), 101 Stat. at 174.

In 1966, Congress transferred the federal power over tolls from the Secretary of the Army (as successor to the Secretary of War) to the Secretary of Transportation.  Department of Transportation Act, Pub. L. No. 89-670, § 6(g)(4), 80 Stat. 931, 941 (1966), repealed by § 135(h), 101 Stat. at 174.  In 1973, Congress directed the Secretary of Transportation to prepare a "full and complete investigation . . . for the purpose of determining what action can and should be taken to assure just and reasonable tolls nationwide."  Federal-Aid Highway Act of 1973, Pub. L. No. 93-87, § 133(a), 87 Stat. 250, 267 (1973).  Congress also directed the Secretary to "promulgate regulations establishing guidelines governing any increase in tolls for use of any bridge constructed pursuant to either the General Bridge Act of 1906 or the General Bridge Act of 1946."  Id. § 133(b).

The Secretary of Transportation thereafter delegated to the Federal Highway Administrator the authority "to determine whether [] tolls are reasonable and just and to prescribe the reasonable rates of toll to be charged."  49 C.F.R. § 310.1 (1986).  Federal regulations were adopted setting forth a process

13

for the filing of an administrative complaint to challenge the reasonableness of tolls. See 49 C.F.R. §§ 310.1-16 (1986). Under the regulations, the Federal Highway Administrator, or a designated Administrative Law Judge, was authorized to consider a complaint from "any person" aggrieved by a toll increase on an interstate bridge. 49 C.F.R. § 310.3(a) (1986); see also Molinari, 838 F. Supp. at 722. The Federal Highway Administrator could conduct an investigation and, if appropriate, hold a formal hearing. 49 C.F.R. § 310.4 (1986). After issuance of a final administrative decision, the complaining party could challenge the agency determination either in federal district court pursuant to the Administrative Procedures Act or in the United States Court of Appeals for the Circuit in which any portion of the bridge was located. See Molinari, 838 F. Supp. at 722.

At the beginning of the 100th Congress, two original bills proposing to deregulate tolls on interstate bridges were introduced. The first of these bills, introduced on January 6, 1987, included a "just and reasonable" provision. See The Federal-Aid Highway Act of 1987, S. 185, 100th Cong., 133 Cong. Rec. 623, 630 (1987) ("S. 185"). The second bill, introduced on January 14, 1987, proposed eliminating federal oversight through the deletion of, inter alia, that portion of § 4 of the Bridge Act of 1906 that allowed the Secretary of Transportation to review whether tolls were "just and reasonable." See Essential Highway Reauthorization Amendments of 1987, S. 312, 100th Cong., 133 Cong. Rec. 1308 (1987) ("S. 312"). Although S. 312 did not include a "just and reasonable" provision, its legislative history helps to clarify the purpose behind the deregulation of tolls. Specifically, the section-by-section analysis accompanying S. 312 provided:

> This section amends various Federal statutes to eliminate the authority of the Federal Highway Administrator to regulate the rate of tolls on bridges by determining the reasonableness of those tolls. States and toll authorities would be given greater flexibility in operating toll facilities. Federal oversight of the reasonableness of tolls has proven to be administratively burdensome, legally unproductive, and has interjected the Federal Government in the role of a mediator in disputes

> which could more appropriately be settled at the State and local level.

133 Cong. Rec. 1308, 1321 (emphasis added).

Additional legislative history reveals that Senator Symms sponsored the Federal-Aid Highway Act of 1986, S. 2405, 99th Cong., 132 Cong. Rec. 9573 (1986) ("S. 2405"), which passed the Senate by a vote of 99 to 0 but did not become law due to a failure of the House and Senate to reach agreement before Congress adjourned. 132 Cong. Rec. 9571 (1986); see 133 Cong. Rec. 2417 (1987) (statement of Sen. Burdick). Section 128 of S. 2405 contained language deregulating tolls in nearly identical terms to those previously proposed in the Interstate Highway Funding Act of 1985, S. 391, 99th Cong., 131 Cong. Rec. 3322 (1985) ("S. 391"). However, the section-by-section analysis for § 128 in S. 2405 merely states: "This section removes Federal regulation and review of toll increases on certain toll bridges. Toll increases on these deregulated facilities must be just and reasonable." 132 Cong. Rec. 9573, 9584 (1986).

S. 2405 did not become law in the 99th Congress, but an identical provision was introduced in the 100th Congress. See Federal-Aid Highway Act of 1987, S. 387, 100th Cong., § 126 (1987) ("S. 387"). The section-by-section analysis for § 126 in S. 387 again focuses on the removal of federal oversight without discussion of a right to sue in federal court: "This section removes Federal regulation and review of toll increases on certain toll bridges. Toll increases on these deregulated facilities must be just and reasonable but will not be subject to review by DOT." 133 Cong. Rec. 2421, 2424 (1987). The Senate inserted the toll deregulation provision from S. 387 into its amended version of H.R. 2, see Joint Explanatory Statement of the Committee of Conference, H.R. Rep. No. 100-27, at 175 (1987) (Conf. Rep.), as reprinted in 1987 U.S.C.C.A.N. 121, 159 ("[a]dopt[ing] the Senate amendment provision"), which finally became law on April 2, 1987. Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17,

§ 135, 101 Stat. 132, 174 (1987) (the "1987 Act").[6]

Upon return of the legislation to the House, Representative Molinari of New York asked Representative Hammerschmidt of Arkansas and Representative Howard of New Jersey to address the meaning of the "just and reasonable" provision.[7] Representative Molinari stated:

> Subsequent to the House passing the conference report on H.R. 2, a number of questions have been raised as to whether section 135, or the statement of managers accompanying section 135, changes in any way the "just and reasonable" standard as it has been applied under existing laws and existing authorities.

Representative Howard replied that

> neither section 135 nor the statement of managers changes the standard to be applied in determining whether a toll increase is just and reasonable. The only thing that we have changed is the forum for making the determination. Toll increases will no longer be subject to review by the Department of Transportation; instead the decision will be left to the courts in the event of a challenge.

133 Cong. Rec. 7348 (1987). Representative Hammerschmidt concurred, stating that "[w]e have not changed the just and reasonable standard in any way." Id.

As noted above, the 1987 Act was not Congress's first effort to enact legislation to eliminate the federal oversight of bridge tolls. Senator Symms of Idaho had proposed earlier

---

[6] Congress passed H.R. 2 in an override of President Reagan's veto.

[7] Representative Howard was Chair of the House Committee on Public Works and Transportation, and Representative Hammerschmidt was the ranking minority member.

legislation in 1984 and 1985.  See S. 391; Federal-Aid Highway Act of 1984, S. 2527, 98th Cong., S. Rep. No. 98-524 (1984) ("S. 2527").  The language proposed in S. 391 was essentially the same as the language that Congress ultimately enacted in 1987 as 33 U.S.C. § 508: "Tolls for passage or transit over any bridge constructed under the authority of the Bridge Act of 1906, as amended, the General Bridge Act of 1946, as amended, and the International Bridge Act of 1972, shall be just and reasonable."  S. 391 § 114(i); see also S. 2527 § 503 (stating in similar terms: "Tolls for passage or transit over any bridge over any of the navigable waters of the United States, if such bridge is used for purposes of travel or transportation in interstate or foreign commerce, shall be just and reasonable. . .").  The Report of the Committee on Environment and Public Works which accompanied S. 391 explained the purpose of including the "just and reasonable" provision:

> The language adopted by the Committee requires that tolls be just and reasonable, both in total and with respect to various vehicle classifications.  By placing this requirement in the statute, the Committee has created a basis for which a user may commence suit in Federal court upon belief that actions of a toll authority are not just and reasonable.

S. Rep. No. 99-2, at 9 (1985).  The Committee Report on S. 2527 used similar language:

> The language adopted by the Committee requires that tolls be just and reasonable, both in total and with respect to various vehicle classifications.  By placing this requirement in the statute, the Committee has created a basis for which a user may commence suit in Federal court if he or she believes actions of a toll authority are not just and reasonable.

S. Rep. No. 98-524, at 7 (1984).  Although S. 391 passed the Senate by a vote of 94-0, neither it nor S. 2527 became law.

The extant regulatory system remained in place until 1987, at which time Congress enacted 33 U.S.C. § 508 and

17

eliminated federal oversight of toll rates with its passage of the Federal-Aid Highway Act of 1987. See 1987 Act. The 1987 Act repealed, inter alia, the portion of § 4 of the Bridge Act of 1906 that allowed the Secretary of Transportation to review whether tolls were "just and reasonable," as well as similar provisions for review in the 1935 Act and in the General Bridge Act of 1946. Id. §§ 135(a), (d), (e). In place of those provisions Congress enacted § 508 with its mandate that tolls be "just and reasonable." Id. § 135(i).

B. The Truckers' arguments based on the legislative history

The Truckers acknowledge that Congress eliminated the ability of toll payers to seek judicial review insofar as it removed the Federal Highway Administrator's authority to review the reasonableness of tolls. The Truckers contend, however, that by retaining the "just and reasonable" standard in § 508 despite repeal of the prior toll-oversight provisions, Congress "impliedly approved the previous challenging system *minus the Administrator*." Appellant's Br. at 18-19. According to the Truckers, Congress intended that a party seeking to challenge a toll rate be able to do so by filing suit directly in federal court without first going through the burdensome process of review by the Federal Highway Administration.

The legislative history reflects a clear congressional desire to remove the executive branch from toll oversight and the resolution of toll disputes. The Truckers argue that Representative Howard's statement that the "decision will be left to the courts in the event of a challenge" is an indication of Congress's intent that the federal courts will review the toll rates. It is questionable whether the statement of one legislator, even if one in a strategic position vis-a-vis the legislation, can be used to reflect congressional intent. At most it indicates that certain members of the House Committee on Public Works believed that judicial review was to be retained with the enactment of § 508.

Other indications in the legislative history cut against the Truckers' claim to a private right of action. As noted, the language of § 508 contains no right-conferring language and

18

makes no mention of judicial review whatsoever. In contrast, such language existed in the statutory provisions repealed when Congress enacted § 508. The Truckers suggest that § 508's silence with respect to judicial review is evidence of a congressional intent to retain it. That argument, however, rests on the shaky inference that Congress meant to create a right of action through the act of repealing provisions that had afforded just such a right. The Truckers have directed us to no other example in which a court has recognized congressional intent to create a private right of action through such legislative wizardry. We would be hard-pressed to rely on that argument here.

The legislative history also contains evidence that weighs against the statement offered by Representative Howard. The section-by-section analysis in the Conference Report on H.R. 2 offers no mention of a toll payer right to sue, and instead focuses solely on the Congressional desire to remove Department of Transportation oversight. Although the Committee Reports on earlier Senate bills, S. 391 and S. 2527, indicate a desire to retain a right of action in federal court, those Reports accompanied bills that did not become law, and the statements they contain provide little confidence that they are an accurate reflection of Congress's intent when it enacted the Federal-Aid Highway Act of 1987. Moreover, Senator Symms, who had sponsored S. 391 and S. 2527, also later sponsored S. 2405, the section-by-section analysis of which makes no reference to a right of action. All of this evidence counsels against placing too great an emphasis on the statements of Representatives Howard and Hammerschmidt.

We have carefully weighed the import of § 508's legislative history in its entirety. Given the nature of Congressional deliberation, it is unsurprising to find that § 508 has a history that offers mixed signals as to whether Congress intended to grant or deny a private right of action. See Exxon Mobil Corp. v. Allapattah Services, Inc., 125 S. Ct. 2611, 2626 (2005) (recognizing that "legislative history is itself often murky, ambiguous, and contradictory"). In the final analysis, we must be mindful that "[w]here a statute does not explicitly create a right of action for a particular party, a court may find such a right implied only where it can confidently conclude Congress

19

so intended."  State of N.J., Dep't of Envtl. Protection & Energy v. Long Island Power Auth., 30 F.3d 403, 421 (3d Cir. 1994) (emphasis added).  Where, as here, a statute is devoid of any right-creating language, there need be a more compelling indication in the legislative history before this court can recognize a right of action.  It is not the province of a federal court to confer rights where statutory language is silent, or to "engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide."  Sierra Club, 451 U.S. at 297.  On this basis, the indicia of a right of action under § 508 are simply not strong enough to support a conclusion that such a right can be inferred.

Notably, § 508's legislative history is clear on one point: Congress intended to remove the federal government from toll oversight because it viewed the regulation of tolls as a matter better left to local officials.  Given this legislative desire, it does not readily follow that Congress would have intended to subject local toll authorities to suit in federal court as a means of enforcing § 508.  Thus, even if we were to reach the third Cort v. Ash factor, which asks whether it is consistent with the underlying purposes of the legislative scheme to imply a remedy, we cannot be sure that it is.  A federal cause of action would interject judicial oversight into toll regulation, thereby putting a branch of the federal government back into the process.

Moreover, while § 508 is a federal directive that local officials set "just and reasonable" rates, the state political process could be the venue that Congress had in mind for the airing of toll grievances.  Here, the Commissioners are political appointees who, at the very least, must remain receptive to the concerns of the politicians whose constituents are affected by their decisions.[8]  Moreover, the state Governors retain a de facto

---

[8] For example, after recent torrential rains and flooding in much of Southeastern Pennsylvania, the Commission issued the following press release:

The Delaware River Joint Toll Bridge Commission, in conjunction with Pennsylvania Governor Edward G.

20

veto power over any course of action adopted by the Commission insofar as they can replace Commissioners who support policies that the Governors (or their constituents) dislike.

The Truckers argue that finding an implied right of action would be consistent with the "implicit" findings of such a right made by the district courts in <u>Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. and N.J.</u>, 706 F. Supp. 264 (S.D.N.Y. 1989), <u>aff'd</u>, 887 F.2d 417 (2d Cir. 1989), and <u>Molinari</u>.  Our review of the case law has uncovered no decision in which a court squarely has held that § 508 affords a private right of action.[9]

<u>Rendell and New Jersey Governor Jon Corzine</u>, announced today that it will suspend tolls this afternoon and evening on the Interstate 78, Easton-Phillipsburg (Route 22), New Hope-Lambertville (Route 202), and Trenton-Morrisville (Route 1) Toll Bridges.  Drivers will not have to pay tolls from 2:00 pm to 7:00 pm today as part of the Commission's effort to alleviate congestion caused by the closure of major roads and flooding conditions in Delaware River communities.

<u>See</u> Delaware River Joint Toll Bridge Commission, <u>Commission Suspends Friday Afternoon and Evening Rush Hour Tolls on Four Delaware River Bridges</u>, June 30, 2006, http://www.drjtbc.org/default.aspx?pageid=394. (emphasis added).

[9]This court addressed a constitutional challenge to a toll increase in <u>Wallach v. Brezenoff</u>, 930 F.2d 1070 (3d Cir. 1991). There, New Jersey citizens filed suit against the Port Authority of New York and New Jersey to challenge toll increases under both § 508 and the federal Commerce Clause.  The plaintiffs in <u>Wallach</u> relied upon the facts established at trial in <u>Automobile Club</u>, where the district court rejected a challenge to the same toll increase. <u>Wallach</u>, 930 F.2d at 1070-71.  In <u>Wallach</u>, the district court granted the Port Authority's motion for summary judgment, and the plaintiffs appealed solely on the constitutional issues.  <u>Id.</u>  We affirmed the denial of the constitutional challenge, and, because the plaintiffs did not pursue their § 508 challenge, we did not have occasion to address whether § 508 afforded them a private right of

In Auto. Club, the district court entertained a toll-payer suit under § 508 on the merits without addressing whether the plaintiffs had a right of action; it appears that the issue of whether the suit was proper under § 508 was never raised. Because the issue was not addressed, we cannot infer that the Auto. Club court "implicitly" considered and adopted the view that a private right of action exists. In Molinari, the district court expressed the view that § 508 likely did not create a private right of action, but the court declined to reach that issue because the toll-payer plaintiffs there failed to create a triable issue on whether the challenged toll increases were just and reasonable. 838 F. Supp. at 724. The Molinari court correctly observed, however, that the Supreme Court long ago refused to find a private right of action in statutory language indistinguishable from that used in § 508. See id. (citing T.I. M. E., Inc. v. United States, 359 U.S. 464, 469 (1959) (statute providing a duty of common carriers "to establish . . . just and reasonable rates") and Montana-Dakota Utilities Co. v. Nw. Pub. Serv. Co., 341 U.S. 246, 250 (1951) (similar duty for gas pipeline companies)).

Finally, the Truckers argue that failing to imply a right of action would effectively grant the Commission unbridled discretion to impose exorbitant tolls, thereby working a violation of the Truckers' procedural and substantive due process rights. This court is not at liberty to infer a private right of action simply because the Truckers fear that the absence of a federal-court remedy for private plaintiffs will lead the Commission to abuse its authority. We note that the Truckers have not raised any constitutional challenge in this proceeding. But cf. Wallach, 930 F.2d 1070.

In sum, given the language of § 508 and the absence of clear indications in the legislative history, we conclude that the District Court did not err in holding that the Truckers lack a private right of action. The Truckers' efforts to realize such a right would be best directed at Congress by pressing for an

action.

22

amendment to § 508.[10]

[10] The Truckers contend in the alternative that if there is no private right of action under § 508, then there is "implicitly" a right of action under the Administrative Procedures Act, 5 U.S.C. § 706 ("APA"), to enforce the just and reasonable standard. Reply Br. at 10. The Commission notes that the Truckers failed to raise the issue of APA review before the District Court, and thus it argues that the issue should not be addressed on appeal. This court generally does not address issues raised for the first time on appeal. United States v. $734,578.82 in U.S. Currency, 286 F.3d 641, 653 (3d Cir. 2002). The Truckers have offered no justification for their failure to preserve the issue of APA review. Indeed, the Truckers took a contrary position before the District Court in arguing that the Commission is not a federal agency or quasi-federal agency for purposes of allowing APA review. On this record, we hold the issue of APA review is waived on appeal and do not address it.

We note that the APA argument could not be resolved on the present record in any event. The Truckers rely upon the analysis set forth in Seal and Co., Inc. v. Washington Metro. Area Transit Auth., 768 F. Supp. 1150 (E.D. Va. 1991), which held that a transit authority created by a compact among Virginia, Maryland, and the District of Columbia could be considered a "quasi-federal agency." The Seal court determined that at least three factors are relevant to whether a compact authority warrants the quasi-federal agency classification: (1) whether the originating compact is governed, either explicitly or implicitly, by federal procurement regulations; (2) whether a private right of action is available under the compact; and (3) the level of federal participation, such as whether Congress was a party to the original compact (rather than simply approving it), and whether the compact replaces a federal agency. See id. at 1156-57; see also Coal. for Safe Transit, Inc. v. Bi-State Dev. Agency, 778 F. Supp. 464, 467 (E.D. Mo. 1991) (holding that bi-state agency had quasi-federal agency status). Assuming arguendo that this court would adopt the three-factor Seal analysis, the factual record before us is not sufficiently developed on the APA issue to permit a meaningful assessment. Moreover, any analysis of the factors would be more appropriately performed by a district court in the first instance.

## III.

For the reasons stated, we will affirm the District Court's judgment holding that the Truckers lack a private right of action under 33 U.S.C. § 508.

_____